UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
NESRIN TABARU,

                                                                                           **16 CV 7460**

        *Plaintiff*,

  -*against*-                                                               **COMPLAINT**

GUARDIAN SERVICE INDUSTRIES, INC.,

        *Defendant*.
------------------------------------------------------------------------X

        Plaintiff Nesrin Tabaru, by her counsel, The Harman Firm, LLP, alleges for her complaint against Defendant Guardian Service Industries, Inc., as follows:

## NATURE OF THE ACTION

        1.      Plaintiff Nesrin Tabaru ("Plaintiff" or "Ms. Tabaru") seeks damages and costs against Defendant Guardian Service Industries, Inc. ("Defendant" or "Guardian"), for discriminating against her based on her national origin (Turkish), age (fifty-five (55) years), and gender (female) by subjecting her to a hostile work environment, treating her less well than employees outside of her protected classes, and failing to promote her, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 and the Age Discrimination in Employment Act ("ADEA"), 42 U.S.C. §§ 621 – 634.

        2.      Plaintiff also seeks damages and costs against Defendant for retaliating against her for her complaints of national origin, age, and gender discrimination, in violation of Title VII and the ADEA.

        3.      Plaintiff also seeks damages and costs against Defendant for discriminating against her based on her national origin, age, and gender by subjecting her to a hostile work

1

environment, treating her less well than employees outside of her protected classes, and failing to promote her, in violation of the NYCHRL.

4. Plaintiff also seeks damages and costs against Defendant for retaliating against her for her complaints of national origin, age, and gender discrimination, in violation of the NYCHRL.

## JURISDICTION, VENUE, AND ADMINISTRATIVE PREREQUISITES

5. Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's claims, as they arise under Title VII and the ADEA.

6. Pursuant to 28 U.S.C. § 1332, this Court has supplemental jurisdiction over Plaintiff's claims arising under the NYCHRL, as the local claims are so related to the federal claims that they form part of the same case or controversy.

7. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Southern District of New York, as a substantial part of the events giving rise to the claims occurred within this District.

8. All conditions precedent to maintaining this action have been fulfilled. A charge of discrimination was filed with the Equal Employment Opportunity Commission ("EEOC"). The EEOC found reasonable cause to believe that violations of Title VII and the ADEA occurred with respect to some or all of the allegations contained in her Charge and issued a Right-to-Sue Letter, dated June 27, 2016, relating to the discriminatory acts described in this Complaint. This action was properly instituted within ninety (90) days of the issuance of the Right-to-Sue Letter.

## TRIAL BY JURY

9. Plaintiff respectfully requests a trial before a jury.

## PARTIES

10.  At all relevant times, Plaintiff was and is a resident of Kings County in the State of New York.

11.  On information and belief, at all relevant times, Defendant was and is a corporation organized under the laws of the State of New York with its principal place of business located at 55 Water Street, New York, NY 10041.

## STATEMENT OF FACTS

12.  On or about July 9, 1990, Guardian hired Ms. Tabaru as a night-shift office cleaner.

13.  Ms. Tabaru is a member of SEIU Local 32BJ (the "Union").

14.  Throughout her tenure at Guardian, Ms. Tabaru has been an exemplary, reliable employee who consistently fulfills all of her job responsibilities.

15.  On or about March 28, 2014, Guardian transferred Ms. Tabaru to a new job location, a commercial building located at 101 Avenue of the Americas, New York, NY 10013 (the "Building").

16.  While working at the Building, Ms. Tabaru reported to several supervisors who are of Albanian national origin: Azran "Danny" Sahmanovic (foreman), Frank Allovic (district supervisor), Brian Magulari (district supervisor), and Jimmy Kolari (foreman).

17.  Guardian's Albanian management subjected Ms. Tabaru to ongoing discrimination and harassment based on her Turkish national origin, as well as her age and gender.

18.  At various times after Ms. Tabaru's transfer to the Building, Mr. Kolari, Mr. Allovic, Mr. Magulari, and Mr. Sahmanovic all stated on a regular basis that they were

prejudiced against Turkish people and frequently made anti-Turkish comments, such as "I don't like the Turkish because the Ottoman Empire captured us for 500 years under the swords."

19. Guardian also subjected non-Albanian employees to different rules than Albanian employees.

20. On federal holidays and in the summer, Albanian employees were allowed to leave work early, while non-Albanian employees were not.

21. For example, on July 17, 2015, during Ramadan, Albanian employees were allowed to leave work at 8:00 p.m., while non-Albanian employees, including Ms. Tabaru, who also celebrates Ramadan, were required to stay until 1:30 a.m. to compensate.

22. Ms. Tabaru's vacation requests were ignored or denied without explanation, while Albanian employees' vacation requests were granted.

23. Guardian required non-Albanian cleaners to work later than Albanian cleaners.

24. Guardian's night-shift office cleaners at the Building were scheduled to work from 5:00 p.m. to 12:15 a.m.

25. Guardian routinely allowed Albanian employees to leave work before the scheduled end of their shift, while non-Albanian employees were regularly required to stay thirty (30) to sixty (60) minutes past the scheduled end of their shift.

26. For example, shortly after her transfer to the Building, Ms. Tabaru noticed that Guardian allowed Mr. Sahmanovic to leave work as early as 10:30 p.m., rather than staying until the end of his shift (12:15 a.m.).

27. Guardian routinely refused to allow Ms. Tabaru to take breaks for meals, whereas Albanian employees were permitted to take regular thirty (30) minute breaks.

28. Guardian's Albanian employees regularly failed to complete their job assignments and were not disciplined for doing so.

29. For example, Albanian employees often spent time at work relaxing and talking with other staff members, rather than completing their job assignments.

30. Non-Albanian employees, in contrast, were harshly reprimanded for not completing all work assigned to them. For example, Ms. Tabaru's Albanian supervisors repeatedly threatened to terminate her if she ever failed to finish all work assigned to her.

31. On April 24, 2014, Ms. Tabaru complained to Mr. Allovic about Mr. Sahmanovic leaving work early and giving his job assignments to Ms. Tabaru.

32. Not only did Mr. Allovic refuse to address Ms. Tabaru's concerns, but he endorsed and actively participated in the discriminatory conduct.

33. On April 25, 2014, Mr. Allovic told Ms. Tabaru, "If it was known that you were Turkish, you wouldn't have been hired here."

34. After the April 24, 2014 complaint, Mr. Allovic and Mr. Sahmanovic began a campaign of retaliation against Ms. Tabaru, including regularly sabotaging Ms. Tabaru's work in attempts to have her employment terminated.

35. For example, for fourteen (14) months, from approximately April 2014 to July 2015, Mr. Sahmanovic intentionally locked the service elevator during Ms. Tabaru's shifts to make it more difficult for Ms. Tabaru to complete her job assignments.

36. In addition, Mr. Sahmanovic repeatedly and intentionally dirtied rooms that Ms. Tabaru had cleaned.

37. On June 16, 2014, Mr. Sahmanovic made a fabricated complaint to Guardian, claiming that Ms. Tabaru had yelled at Guardian security. Mr. Allovic supported Mr.

Sahmanovic's false complaint and required Ms. Tabaru to meet with Jeremy Bressler, Guardian's VP of Janitorial Operations and the son of Guardian's COO.

38. On June 17, 2014, Ms. Tabaru met with Mr. Bressler. In this meeting, Ms. Tabaru told Mr. Bressler that Mr. Sahmanovic and Mr. Allovic's assertion was untrue and complained to him of their ongoing discrimination and harassment.

39. The false complaint was dismissed, yet Mr. Bressler did not make any attempt to address the discriminatory behavior.

40. On or around October 10, 2014, Guardian terminated Mr. Allovic's employment.

41. After Mr. Allovic was terminated, Mr. Sahmanovic's discrimination and retaliation against Ms. Tabaru intensified.

42. Mr. Sahmanovic began destroying Guardian work equipment, such as vacuums, mop ringers, and dust pans to prevent Ms. Tabaru from doing her job.

43. Ms. Tabaru notified Mr. Bressler of Mr. Sahmanovic's behavior, to no avail.

44. On or around November 24, 2014, Mr. Magulari became Ms. Tabaru's supervisor.

45. Upon finding out that Ms. Tabaru is Turkish, Mr. Magulari immediately began to harass and discriminate against her, as well.

46. For example, on his first day as Ms. Tabaru's supervisor, Mr. Magulari told her, "I hate Turkish people. They hang Albanian people at roadsides and forced us to be Muslim with their swords."

47. On or around November 28, 2014, Ms. Tabaru complained to Mr. Bressler about the continuing discrimination and harassment.

48. Mr. Bressler told Ms. Tabaru that he would "look into" the issue; however, nothing was done, and Mr. Magulari and Mr. Sahmanovic continued to harass and discriminate against Ms. Tabaru.

49. In or around January 2015, Mr. Sahmanovic began to make offensive and discriminatory remarks about Ms. Tabaru to other Guardian employees, including telling Guardian employees that Ms. Tabaru is "stupid," "stinks like a pig," and "gets fired everywhere she works."

50. Guardian required Ms. Tabaru to complete more tasks and clean more square footage of the Building than other workers, including instructing her to take on Mr. Sahmanovic's job responsibilities.

51. Mr. Sahmanovic would not do the work because, according to Mr. Sahmanovic, he "did not care that [Ms. Tabaru] was working extra since she is Turkish."

52. Ms. Tabaru's employment contract stipulates that she not be assigned to clean an area larger than thirty-two thousand (32,000) square feet.

53. In and around early 2015, Ms. Tabaru began to suspect that, due to her increased workload, the area that she was assigned to clean now exceeded the permitted thirty-two thousand (32,000) square feet.

54. In light of this, Ms. Tabaru requested that Guardian measure the square footage of the space that she was required to clean to ensure that her job assignments were in accordance with the terms of her contract.

55. When Ms. Tabaru asked Mr. Magulari to measure the space she was assigned to clean, however, he dismissed her request, telling her, "Good luck, honey, you have been working here over six months. That means you are stuck with it."

56. On March 12, 2015, Ms. Tabaru met with Mr. Magulari and Mr. Bressler to complain about Mr. Sahmanovic's ongoing harassment, discrimination, and retaliation.

57. Mr. Magulari and Mr. Bressler dismissed Ms. Tabaru's complaints.

58. In addition, when Mr. Sahmanovic learned that Ms. Tabaru had complained about his discriminatory and retaliatory conduct, he threatened her, stating, "If you complain about me and I lose my job, I'll hurt you."

59. On March 31, 2015, Ms. Tabaru reported Mr. Sahmanovic's threat to Guardian, but nothing was done.

60. Ms. Tabaru emailed Mr. Bressler in and around March 27, 2015, April 27, 2015, and June 16, 2015, requesting that the space she was assigned to clean be measured and raising concerns about Guardian's inequitable distribution of labor.

61. However, despite Ms. Tabaru's multiple requests and Mr. Bressler's reply that he would "investigate" the issue, Guardian repeatedly refused to measure the space Ms. Tabaru was required to clean or otherwise address her complaints of an unfairly increased workload.

62. Mr. Sahmanovic continued to increase Ms. Tabaru's workload.

63. On March 12, 2015, March 30, 2015, and June 15, 2015, Mr. Sahmanovic left work before the end of his shift and left garbage for Ms. Tabaru to pick up.

64. Guardian also treated its male employees better than its female employees.

65. Female employees were consistently given more work than male employees; for instance, individual female employees were assigned tasks intended for three (3) to five (5) workers.

66. At various times from approximately 2005 to 2015, Ms. Tabaru asked Guardian for a promotion, in light of her seniority and excellent employment record.

67. On or about June 20, 2015, Ms. Tabaru met with Mr. Bressler and Lyn Bressler, Guardian's Director of Human Resources, and asked to be promoted to forewoman.

68. Guardian refused her request. Mr. Bressler replied that he "couldn't afford to have a forelady," even though Ms. Tabaru clarified that she was not asking for a pay raise, only for more responsibility.

69. However, other (male, Albanian) employees with less experience had recently been promoted, including Mr. Sahmanovic, and approximately two (2) weeks after Ms. Tabaru's request, Mr. Bressler hired a new foreman, Mr. Kolari (who is male and Albanian).

70. On or around July 20, 2015, Mr. Sahmanovic left coffee stains on the floor after picking up the garbage at the eighth floor elevator dock in the Building.

71. It was Mr. Sahmanovic's duty to mop the floor, yet he took photos of the dirty floor and sent them to Guardian, falsely claiming that Ms. Tabaru had not mopped the area assigned to her.

72. On or about July 22, 2015, Guardian issued Ms. Tabaru a warning for "unsatisfactory work" based on Mr. Sahmanovic's entirely untrue allegations.

73. On or about July 23 or 24, 2015, Ms. Tabaru filed a grievance with the Union in regards to the warning stemming form Mr. Sahmanovic's fabricated complaint; the warning was dismissed.

74. On or about July 27, 2015, Guardian terminated Mr. Sahmanovic's employment.

75. On or about August 3, 2015, Mr. Kolari became Ms. Tabaru's supervisor.

76. Upon becoming a supervisor at the Building, Mr. Kolari reassigned Albanian employees' job responsibilities to non-Albanian employees so that Albanian employees had fewer tasks to complete and could leave work before their shifts were scheduled to end.

77. Mr. Kolari made many hostile and discriminatory comments to Ms. Tabaru on the basis of her age and gender throughout his time as her supervisor, including:

   a. "You are a bitch and stupid to work this hard for 25 years."

   b. "You're too old for this job. Why don't you retire?"

   c. "[Mr. Bressler] doesn't like older people, especially women."

   d. "[Mr. Bressler] has told me to get rid of you so he could replace you with someone younger that spends less hours [at work] and gets half of what you get."

   e. "You're old, you should quit."

   f. "Why should we pay you what we pay you? We could get someone younger for less money."

78. Mr. Kolari threatened to get Ms. Tabaru terminated in retaliation for her complaints of discrimination and harassment, repeatedly told her that Guardian wanted to fire her, and discouraged her from complaining further, making statements such as:

   a. "[Mr. Bressler] is begging me to find you at fault to be able to fire you."

   b. "You're not taking lunch? Good, [Mr. Bressler] doesn't want you to take lunch."

   c. "Don't bother [Mr. Bressler], he doesn't want to see you or hear from you."

   d. "We're watching you."

   e. "We're getting paid to get rid of you."

   f. "[Mr. Bressler] is too powerful, too rich. You're nothing, he can fire you with a snap of his fingers."

  g. "Stop e-mailing and going to [Mr. Bressler's] office.  He cannot be told what to do, he wants to do what he wants to do, and he wants you to fear him."

79. Mr. Kolari repeatedly referred to Ms. Tabaru with sexist slurs such as "bitch."

80. Ms. Tabaru never heard Mr. Kolari make any comments like those described in paragraphs 77 through 79 to Albanian or male employees.

81. Ms. Tabaru complained to Mr. Bressler on or about September 15, 2015, about the continuing discrimination, harassment, and retaliation, and again raised concerns about her unfair workload.

82. However, as before, these complaints were never addressed, and the discriminatory treatment continued.

83. When he learned of Ms. Tabaru's September 15, 2015 complaint, Mr. Kolari threatened to extend Ms. Tabaru's shifts even later in response, telling her, "If you don't shut up, [Mr. Bressler] is going to make you come to work later."

84. On or about September 21, 22, and 23, 2015, Guardian sent Maria Alcan, a supervisor at Guardian, to measure the floor.

85. However, when Ms. Tabaru asked Mr. Kolari for the results of Ms. Alcan's measurements, he refused and mocked her, telling her, "Are you stupid or what?  This measurement has nothing to do with you.  You are not important, they are measuring the floor for a client."

86. On October 1, 2015, Ms. Alcan came to inspect the Building and praised Ms. Tabaru's work performance, stating that Ms. Tabaru's floor had been cleaned best out of all the floors in the Building.

87. On October 9, 2015, Mr. Magulari told Ms. Tabaru that she was not allowed to work on Columbus Day, which was a regular working day for Ms. Tabaru and for which she would have been paid an extra day's wages, according to Union rules.

88. On October 12, 2015, Mr. Kolari, a non-Union employee, took over Ms. Tabaru's job responsibilities on Columbus Day.

89. On October 13, 2015, Ms. Tabaru filed a grievance with the Union.

90. On that same day, October 13, 2015, Mr. Kolari told Ms. Tabaru, "You are a stupid bitch," and that making a complaint to the Union would be useless.

91. On October 15, 2015, shortly after Ms. Tabaru filed the October 13, 2015 grievance with the Union, Guardian again sent Ms. Alcan to inspect the Building.

92. This time, however, Guardian sent Ms. Alcan to inspect the floor assigned to Ms. Tabaru while there was ongoing construction on Ms. Tabaru's floor. Guardian issued a negative review to Ms. Tabaru and blamed her for the construction-related debris on her floor, intentionally targeting Ms. Tabaru and attempting to fabricate performance issues in retaliation for her complaints.

93. On or about November 16, 2015, Johnny Fernandez began working at Guardian as a cleaner.

94. From the beginning of his employment at Guardian, Mr. Fernandez subjected Ms. Tabaru to discriminatory treatment and harassment.

95. Mr. Fernandez told Ms. Tabaru that Guardian needed to "watch her" so that Guardian could be sure she was doing her job.

96. Mr. Fernandez took pictures of Ms. Tabaru at work without her consent, saying that he "needed to take them for Mr. Bressler" to prove that Ms. Tabaru was working; no other Guardian employees were subjected to this treatment.

97. Mr. Fernandez would intentionally sneak up on Ms. Tabaru and scare her while she was alone on a floor cleaning. Ms. Tabaru repeatedly asked Mr. Fernandez to stop, but he merely laughed at her in response, and the harassment continued.

98. Mr. Fernandez told Ms. Tabaru, "If I fire you, [Mr. Bressler] promised me a $10,000 bonus."

99. On or about December 9, 2015, Mr. Kolari started to increase Ms. Tabaru's workload yet again.

100. Mr. Kolari showed Ms. Tabaru a letter from Guardian, which stated that the work that Ms. Tabaru and two (2) other non-Albanian, female employees had been assigned was intended for five (5) workers, rather than three (3). Mr. Kolari told Ms. Tabaru, "You see how stupid you are, doing this extra work? You can't do nothing about it."

101. On December 10, 2015, Ms. Tabaru filed a grievance with the Union regarding the extra work assigned to non-Albanian, female employees.

102. On December 11, 2015, Ms. Tabaru filed a charge of discrimination with the EEOC, detailing Guardian's ongoing discrimination and harassment.

103. Mr. Fernandez repeatedly failed to complete his job duties and received several major complaints regarding his work performance throughout December 2015 and January 2016.

104. On February 16, 2016, Guardian terminated Mr. Magulari's employment.

105. On March 7, 2016, Guardian promoted Mr. Fernandez to foreman, despite his history of poor work performance.

106. Mr. Fernandez, who knew that Ms. Tabaru had asked to be promoted to forewoman, said to Ms. Tabaru, "You see, Ms. Nesrin, [Mr. Bressler] picked me over you. He don't like older women, and that's why he picked me instead of you."

107. On March 28, 2016, at approximately 9:00 p.m., Mr. Fernandez entered the women's bathroom while Ms. Tabaru was in the bathroom, stating that he needed to "watch her."

108. On or around March 30, 2016, Ms. Tabaru filed a grievance with the Union regarding Mr. Fernandez's inappropriate and harassing behavior.

109. Shortly afterward, Guardian transferred Mr. Fernandez to another location and reassigned Mr. Kolari to the Building.

110. Guardian transferred William Smith (foreman) to the Building in and around April 2016.

111. Mr. Smith also targeted and discriminated against Ms. Tabaru.

112. For example, Ms. Tabaru was the only employee whom Mr. Smith did not allow to take a meal break.

113. On or around April 27, 2016, Ms. Tabaru and eight (8) other members of the evening shift staff filed a formal complaint with Mr. Bressler about Guardian's regularly requiring non-Albanian workers to stay past the end of their shifts.

114. To date, Mr. Bressler has not addressed the ongoing discriminatory treatment.

115. On or about September 8, 2016, Mr. Smith told Ms. Tabaru that his job was to "watch her."

116. Guardian continues to subject Ms. Tabaru to harassment, discrimination, and retaliation.

# CAUSES OF ACTION
## FIRST CAUSE OF ACTION
**National Origin, Age, and Gender Discrimination in Violation of Title VII and the ADEA**

117. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 116 with the same force as though separately alleged herein.

118. Title VII prohibits employers from discriminating against an employee in compensation, terms, conditions or privileges of employment on the basis of, among other things, national origin or gender.

119. The ADEA prohibits employers from discriminating against employees over forty (40) years of age on the basis of age.

120. Defendant discriminated against Plaintiff by treating her less well than Albanian, young, or male employees; subjecting her to offensive comments that were so severe and pervasive that they altered the terms, conditions, or privileges of her employment; and failing to promote her.

121. As a direct and proximate consequence of Defendant's national origin discrimination, Plaintiff has suffered, and continues to suffer, emotional distress and suffering.

122. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## SECOND CAUSE OF ACTION
**Retaliation in Violation of Title VII and the ADEA**

123. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 122 with the same force as though separately alleged herein.

124. Title VII prohibits an employer from discriminating against any employee because she has opposed any practice unlawful under Title VII.

125. The ADEA prohibits an employer from discriminating against any employee because she has opposed any practice unlawful under the ADEA.

126. Plaintiff complained to Defendant about an unlawful employment practice, namely, being subjected to harassing and discriminatory comments and conduct based on her national origin, gender, and age.

127. Defendant retaliated against Plaintiff by, *inter alia,* subjecting her to further offensive discrimination and harassment, refusing to reprimand the discriminatory behavior, and failing to promote her.

128. As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, substantial economic and non-economic damages, including, but not limited to, emotional distress and suffering, all in amounts to be determined at trial.

129. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## THIRD CAUSE OF ACTION
**National Origin, Age, and Gender Discrimination in Violation of the NYCHRL**

130. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 129 with the same force as though separately alleged herein.

131. The NYCHRL prohibits employers from discriminating against an employee in compensation or in terms, conditions or privileges of employment on the basis of, among other things, national origin, age, or gender.

132. Defendant discriminated against Plaintiff by subjecting her to offensive comments and harassment based on her national origin, age, and gender; treating her less well than non-Albanian employees, younger employees, and male employees; and failing to promote her.

133. As a direct and proximate consequence of Defendant's discriminatory conduct, Plaintiff has suffered, and continues to suffer, emotional distress and suffering.

134. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights.  Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## FOURTH CAUSE OF ACTION
### Retaliation in Violation of the NYCHRL

135. Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 134 with the same force as though separately alleged herein.

136. The NYCHRL states that an employer cannot retaliate or discriminate against an employee because that employee has opposed any practice prohibited under the NYCHRL.

137. Plaintiff complained to Defendant about discriminatory conduct prohibited under the NYCHRL, namely, being subjected to offensive comments, harassment, and discriminatory treatment based on her national origin, age, and gender.

138. Defendant retaliated against Plaintiff by, *inter alia,* subjecting her to further offensive discrimination and harassment, refusing to reprimand the discriminatory behavior, and failing to promote her.

139. As a direct and proximate consequence of Defendant's retaliation, Plaintiff has suffered, and continues to suffer, emotional distress and suffering in amounts to be determined at trial.

140. Defendant's discriminatory treatment of Plaintiff was willful and in reckless disregard of Plaintiff's protected rights. Accordingly, Plaintiff is entitled to an award of punitive damages against Defendant.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A.  for the first cause of action, damages to be determined at trial;

B.  for the second cause of action, damages to be determined at trial;

C.  for the third cause of action, damages to be determined at trial;

D.  for the fourth cause of action, damages to be determined at trial; and

E.  such other and further relief as the Court deems just and proper.

Dated:   New York, New York
September 23, 2016

By: _____

Walker G. Harman, Jr. [WH-8044]
Edgar M. Rivera [ER-1378]
THE HARMAN FIRM, LLP
220 Fifth Avenue, Suite 900
New York, NY 10001
(212) 425-2600
wharman@theharmanfirm.com
erivera@theharmanfirm.com

*Attorneys for Plaintiffs*